EXHIBIT 4

# ORIGINAL

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------x

WILHELM H. MICKELSEN,           :

              Plaintiff,   : Civil Action No.

  -against-            : 08 CV 10138

BERTELSMANN, INC. and       :    (TPG)

OFFSET PAPERBACK MFRS., INC.  :

           Defendants.  :

--------------------------------x

          May 13, 2010

          9:05 a.m.


    Deposition of **DAVID LIESS,** held at the law offices of Schwartz & Perry LLP, 295 Madison Avenue, New York, New York, before Susan B. Ratner, a Shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S :


SCHWARTZ & PERRY LLP

Attorneys for Plaintiff

    295 Madison Avenue

    New York, New York 10017

BY:  BRIAN A. HELLER, ESQ.


BRODY & BROWNE LLP

Attorneys for Defendants

    One Penn Plaza - Suite 3512

    New York, New York 10019

BY:  LAUREN REITER BRODY, ESQ.


ALSO PRESENT:

    WILHELM H. MICKELSEN

23

1                    D. Liess

2          MRS. BRODY:   Objection.

3          I don't believe that that was the

4     testimony.

5     A.    I think, if I am not mistaken, I said

6     that my attorney advised me what was in this

7     complaint.

8     Q.    Once again, I don't want to know anything

9     that your attorney said to you.

10         What I do want to know is, what is your

11    understanding of Bill Mickelsen's allegations against

12    the company?

13    A.    My belief?

14    Q.    No.

15         What I am asking you is, what is your

16    understanding of what Bill Mickelsen's claims,

17    allegations, accusations are against the company?

18    A.    My understanding is that Bill Mickelsen

19    feels that he was discriminated against, even though

20    he still has a job, and that is pretty much it.

21         It's tough for me to answer this question

22    without telling you what I believe about it.

23         I think that it's nonsense, to be honest

24    with you.

25         That is my belief.  That is my opinion.

D. Liess

That is my feeling.  That is every emotion I have.

If I can be blunt with you, this is 100 percent total bullshit.

Q.    So this is bullshit, even though you have never read the complaint, correct?

MRS. BRODY:  Objection.

MR. HELLER:  I will withdraw the question.

MRS. BRODY:  Brian, we are going to take a break.  You are too excited and you are yelling at my client.

THE WITNESS:  I'm cool.  He's not going to rattle me.

MRS. BRODY:  I was actually hoping that he could calm down a little.

THE WITNESS:  He is not going to rattle me.  You don't have to worry about that.

MR. HELLER:  Lauren, the witness and I are doing fine together.  I've got to tell you.

MRS. BRODY:  I don't like to be in a deposition when the examiner is yelling at the witness.

MR. HELLER:  I am not yelling at him,

1                          D. Liess

2           Lauren.

3                   THE WITNESS:  Well, I'm not feeling

4           the love there, my man, but that's okay.

5                   MR. HELLER:  That goes both ways.

6                   I'm doing fine.  I hope that you're

7           doing fine.

8                   THE WITNESS:  Oh, man, I've dealt with

9           worse than you, so --

10                  MR. HELLER:  I'm sure you have, and

11          I've dealt with worse than you, so we're all

12          good.

13                  Q.    So you believe that the lawsuit is

14    bullshit even though you have never read the

15    complaint, correct?

16                  A.    I have not read the complaint, but I am

17    aware of what is in the complaint, and that's what I

18    feel is bullshit.

19                  Q.    What are you aware of that is in the

20    complaint?

21                  A.    That Bill Mickelsen is seeking damages

22    for age discrimination.  He feels that he has been

23    discriminated against.

24                  Q.    To your understanding, how does Bill

25    Mickelsen allege that he was discriminated against?

```
 1                    D. Liess
 2                    Okay.
 3                    THE WITNESS:  Can I ask you a question?
 4                    With all due respect, I just want to
 5            ask you a question.
 6                    MR. HELLER:  Maybe after the deposition
 7            you can ask me a question.
 8                    THE WITNESS:  All right.
 9            Q.    Do you know what Bill Mickelsen has
10      alleged that you have done to him that is
11      discriminatory?
12            A.    Not necessarily.
13            Q.    How long have you known Bill Mickelsen?
14            A.    I have known Bill Mickelsen 24 years,
15      25 years.
16            Q.    You started working with him in 1986,
17      correct?
18            A.    I guess that is when it was.
19                    I don't know if I had met him before or
20      not.
21                    When I started with the company he was
22      already with the company.
23            Q.    Have you ever traveled together?
24            A.    Yes.
25            Q.    Have you ever spent time together outside
```

1                        D. Liess

2     of work?

3          A.    Yes.

4          Q.    Were you friends?

5          A.    Yes.

6          Q.    And you weren't interested to know what

7     his allegations were against the company of which you

8     were the CEO?

9                MRS. BRODY:   Objection.

10               He has already answered that question

11          over and over and over again.

12         Q.    You can answer it.

13               MRS. BRODY:   He gave it to his legal

14          team.

15               MR. HELLER:   Please don't give him the

16          answer.

17               MRS. BRODY:   The answer is in the

18          record.

19         A.    The answer remains unchanged that I

20    forwarded everything to my legal advisor when I

21    receive the information.

22               I can tell you that I was very hurt that

23    Mr. Mickelsen would think that I would do this to

24    him.

25         Q.    Is he alleging that you did this to him?

1                         D. Liess

2     Americas?

3          A.    Yes.

4          Q.    Who do you report to?

5          A.    I report to Rolf Buch.

6          Q.    What is his position?

7          A.    He is CEO of Arvato.

8          Q.    Of Arvato --

9          A.    Worldwide.

10         Q.    Do you know if it's Arvato AG?

11         A.    I don't think it is, but I don't really

12    know.

13               I know that it's Arvato.  I don't know if

14    there's an AG behind that baby or not.

15         Q.    Where is Arvato Print of the Americas

16    headquartered?

17         A.    At 1700 Broadway, New York City.

18         Q.    Where is Offset Paperback Mfrs.

19    headquartered?

20         A.    They are headquartered in Dallas,

21    Pennsylvania.

22         Q.    Where is their principal place of

23    business?

24         A.    Dallas, Pennsylvania.

25         Q.    Are you aware of any filings made with

1                       D. Liess

2    the New York State Secretary of State with respect to

3    Offset Paperback Mfrs.?

4          A.    I am unaware.

5                I can tell you that I sign a lot of

6    documents that are reviewed, I guess for consent

7    forms, et cetera, et cetera.

8                Are any of those filed with the state, I

9    honest to God couldn't tell you.

10         Q.    Do you know if Offset Paperback Mfrs.

11   identifies New York City as its principal place of

12   business with the New York State Secretary of State?

13         A.    I can't answer that.

14         Q.    Where do you work?

15               I think we got your address earlier, but

16   where are your offices located?

17         A.    Got a week?

18         Q.    You have more than one office?

19         A.    Yes.

20         Q.    Where is your main office?

21         A.    I guess it's safe to say that my main

22   office is here at 1700 Broadway.

23         Q.    Where were the decisions with respect to

24   Bill Mickelsen made, geographically?

25               MRS. BRODY:  Objection.

1                          D. Liess

2          Q.    Are you capable of testifying today --

3          A.    Absolutely.

4          Q.    -- or are you incapacitated from last

5    night?

6          A.    No.

7                I was in bed by 11:30.

8          Q.    When did you first see this letter?

9          A.    When Bill gave it to me, which I assume

10   was somewhere in November 2007.

11               I don't know if it was on the fourth or

12   not, but that is when I got it.

13         Q.    What do you recall about seeing this

14   letter for the first time?

15         A.    That it was full of inaccuracies, and I

16   wanted to discuss it with him.

17         Q.    Where were you physically when you first

18   saw the letter?

19         A.    I was at Offset Paperback, in the corner

20   office.

21         Q.    Is it your office?

22         A.    I share it with Jack O'Donnell.

23         Q.    Who is Jack O'Donnell?

24         A.    Jack O'Donnell is the general manager of

25   Offset Paperback.

86

D. Liess

1

2          THE WITNESS:  I'm in trouble.

3          MRS. BRODY:  No, you're not.

4     A.    Yes, he is complaining about age.

5          MRS. BRODY:  All right, let's go.

6          MR. HELLER:  We can take a break.

7          Off the record.

8          (Discussion off the record.)

9          (Short recess taken: 10:36 a.m. to

10     10:39 a.m.)

11          MR. HELLER:  Back on the record.

12     **BY MR. HELLER:**

13     Q.    How long have you been Bill Mickelsen's

14     supervisor?

15     A.    Since approximately March, April of 2007.

16     Q.    Have you ever given Bill Mickelsen a

17     performance evaluation?

18     A.    I don't do performance reviews.

19     Q.    Have you ever done anything to speak to

20     him or advise him of his performance?

21     A.    Where we had an official pow-wow, no.

22     Q.    Have you done things that are unofficial?

23     A.    Specifically with Bill, I probably talked

24     about needing to grow the business, and we need our

25     salespeople to get out there and pound the pavement

REPORTERS CENTRAL, LLC * (212) 594-3582

1                          D. Liess

2    and grow the business, et cetera, et cetera.

3          Q.     That is a constant always, correct?

4          A.     Yes.

5          Q.     You always need the salesmen to grow the

6    business and to pound the pavement, correct?

7          A.     Yes.

8          Q.     Jack O'Donnell left Offset Paperback,

9    correct?

10         A.     He left Offset Paperback?

11         Q.     Yes.

12         A.     No.

13         Q.     He is still there?

14         A.     Yes.

15         Q.     What is his position now?

16         A.     He is the executive vice-president and

17   COO of Offset Paperback.

18         Q.     How long has he served in that capacity?

19         A.     Approximately the same time as I have

20   been Bill's supervisor.

21                I am going to say March, April of 2007.

22         Q.     I believe that I may have asked you this,

23   and I apologize if I did, was he in that same

24   position when you received this letter in November of

25   2007?

1                         D. Liess

2           A.    Yes.

3           Q.    How old is Mr. O'Donnell?

4           A.    He is 48 or 49.

5           Q.    What --

6           A.    He is younger than me.

7           Q.    How old are you?

8           A.    I am 51.

9           Q.    What is your date of birth?

10          A.    1/21/59.

11          Q.    Do you know how much older Bill Mickelsen

12    is as compared to you?

13               MRS.  BRODY:  Didn't we just go through

14         this?

15               Should we do the math?

16               MR. HELLER:  Yes, I am asking him to

17         do the math.

18               MRS. BRODY:  This is a test.

19          A.    I don't know Bill's age.

20               Is he 64?

21               THE WITNESS:  (To Mr. Mickelsen)  How old

22         are you?

23          A.    If he is 64, there is a 13-year

24    difference.

25               If he is 68, there is a 16-year age

1                              D. Liess

2                I was very, very disappointed that Bill

3    would feel that anything was done to him as a result

4    of the relationship that he and I had for so many

5    years.

6                You have to remember, my children -- my

7    wife was pregnant with one of my children, and we

8    would spend weekends at Bill's house.

9                Then, after they were both born, we would

10   throw tissues into Bill Mickelsen's fireplace, and we

11   were very, very, very tight, so I was extremely

12   disappointed that this is how I found out that Bill

13   was as unhappy as he apparently was.

14        Q.   What emotions did you feel?

15        A.   I think that the biggest one was

16   disappointment that the personal relationship that we

17   had meant absolutely nothing to Bill, and he feels

18   that the company would intentionally do something to

19   him.

20        Q.   Why were you disappointed that he would

21   feel that way?

22        A.   I was disappointed because I know the

23   facts of the situation, and the facts, as far as I

24   was concerned, did not warrant him -- anything that

25   was in this letter.

1                        D. Liess

2     alleging that his age played a role indicated to you

3     that he felt your personal relationship meant

4     nothing?

5          A.    No.

6                Age and our relationship had nothing to

7     do with what I felt.

8          Q.    Did you think that Bill Mickelsen's

9     complaint of age discrimination indicated that your

10    personal relationship with Bill meant nothing?

11         A.    No, that is not what I felt.

12               It was really that Bill would think that

13    I would allow something be done to him that was

14    discriminatory.  That is what upset me.

15               He was one of my closest friends in the

16    business.

17         Q.    What makes you think that Bill thought

18    that your personal relationship meant nothing?

19               MRS. BRODY:  He just answered that

20          question.

21         A.    Because I felt that a verbal

22    discussion would have been much more -- if we had a

23    personal relationship, we would have had a

24    discussion, as opposed to resorting to this

25    (indicating).

1                            D. Liess

2        A.   Executive vice-president and sales.

3        Q.   In what company does he function?

4        A.   He functions in all four.

5        Q.   Is he part of Arvato Print, that --

6        A.   Yes.

7        Q.   Was he in that position in July of 2007?

8        A.   He was executive vice-president and

9   vice-president of sales for Coral Graphics Services

10  at that time.

11       Q.   So the two people telling Bill Mickelsen

12  about the change in his compensation were from Coral

13  Graphics, correct?

14       A.   Yes.

15       Q.   They were not from Offset Paperback?

16       A.   No, they were not.

17       Q.   Why were two representatives from one

18  company telling the employee of a wholly separate

19  company about his new compensation agreement?

20       A.   Because they were part of what was

21  labeled the Guiding Coalition for the restructuring

22  that was taking place to get rid of  the four

23  separate companies, and try to bring one united front

24  in.

25            They were the guys that were -- if I can

1                         D. Liess

2      back up a minute, I can tell you that the sales

3      compensation plan that the two of them devised for

4      the Coral Graphics salespeople was the sales

5      compensation plan that we were bringing into this new

6      organization with the existing salespeople from

7      Offset Paperback and Berryville Graphics.

8           Q.    When was that compensation plan for Coral

9      Graphics developed?

10          A.    Probably mid to late 2006.

11          Q.    Who is on this Guiding Coalition?

12          A.    The Guiding Coalition was Jack O'Donnell

13     -- and I am sure you are going to want his age -- who

14     is 48 or 49.

15                Rick Pincofski, who I believe is 56;

16     Dennis Carey, who is 68; myself, 51; Chris Smith, 31;

17     Jared Verano, 31; Bob Robinson, I am not 100 percent

18     sure of, but I am going to say 50.

19                I believe that covers it.  That was our

20     Guiding Coalition.

21          Q.    Was Markus Dohle part of that Guiding

22     Coalition?

23          A.    Yes.

24          Q.    Was he on the coalition?

25          A.    No.

1                           D. Liess

2    when you take a look at what they are making.

3                It was a very, very frustrating topic for

4    me because I would see that we are paying a lot of

5    money to people that basically I would not even label

6    as salespeople.  I would label them as field customer

7    service reps.

8         Q.    I understand why you wanted to make that

9    change.

10               My question is, what steps did you take

11   once you identified the problem?

12               Did you conduct some kind of

13   investigation?  Did you appoint some kind of

14   committee?  Did you conduct some kind of inquiry into

15   what the facts were, identify any solutions?  What

16   did you do to identify that problem?

17        A.    We found out what our competitors were

18   paying, at the time it was Phoenix Color and Lehigh

19   Press, and we saw that they had a higher component

20   tied to growth for the compensation, but the bulk of

21   their compensation was on the size of the account

22   package.

23               Mitch Weiss had worked at Phoenix Color,

24   so he had intimate knowledge about how they paid

25   their salespeople.  He has a tremendous amount of

114

1                         D. Liess

2     contacts in the industry.

3                    Did he research it?

4                    Yes, he researched it.

5                    Who did he research it with?

6                    I really don't know.

7          Q.    Was there any kind of written report that

8     was made?

9          A.    On what we were going to do?

10                   No.  We had verbal discussions about it.

11                   Did he maybe make some diagram as to what

12    his thought process was?

13                   Maybe he did.

14                   I liked the sound of it.  I said, "Let's

15    see how it looks.  Let's apply it, put a spreadsheet

16    together," and I saw that if a salesperson grows

17    their business, they stand to make more money.

18                   If they stay at the same level with no

19    growth, they take a hit, where they would maybe make

20    a little bit less.

21                   It was geared towards growth, as it

22    should be.

23         Q.    So the salesmen, if they continued to

24    grow the business, they would stay at the same level?

25         A.    No.

1                         D. Liess

2          that you wanted because it was a poor question.

3               MR. HELLER:  Oh, it's the question's

4          fault.  I see.

5               Thank you, Lauren.

6               MRS. BRODY:  I understood exactly what

7          he was saying, and you did not get it.

8               MR. HELLER:  I am sure that you

9          understood everything exactly.

10              MRS. BRODY:  Brian, ask the right

11         question, and you will get the right answer.

12              MR. HELLER:  I would like the question

13         read back, and then I would like an answer.

14              (Question read.)

15         A.    We did not just wake up one morning,

16    and call the salespeople in and say, "Here, this is

17    what you are getting."

18              They were given notice based upon -- I

19    don't know if we told them three months, if we told

20    them the beginning of next year, whatever it was,

21    that there was going to be an adjustment to the

22    compensation.

23              The compensation was going to be geared

24    towards growth as opposed to sustainability.

25              I am not going to tell you that we gave

1                           D. Liess

2    them three months' notice, or that we gave them

3    three days' notice, but we did give them notice,

4    period.

5              We reviewed the plan with them.  They

6    understood the plan.  At the end of the 12-month

7    period, if they grew their sales, then they made

8    money.  If they did not grow their sales, it either

9    stayed the same, or they had a decrease in their

10   business.

11             I am not interested in hiring field

12   customer service people.  I am interested in hiring

13   salespeople.

14             Salespeople go out and they find new

15   business.  They should have to buy a brand new pair

16   of shoes every week because they wore holes in them.

17             Our salespeople were not doing that.

18   They had to buy new pants because they had holes in

19   the ass of their pants.  That is because they were

20   sitting in their offices, and that was it, that is

21   not the way you sell in Dave Liess' world.  You get

22   out and you knock on doors and you sell.

23             I hope that I have clarified that.

24       Q.    Did you give them notice in writing?

25       A.    I would have to check with Mitch Weiss on

118

1                        D. Liess

2    that.

3    RQ          MR. HELLER:  I am going to ask for all

4           documentation regarding this change in the

5           compensation plan.   I think that it has become

6           an issue.

7                   MRS. BRODY:  In 2006, for Coral Graphics;

8           are you kidding?

9                   MR. HELLER:  No, I'm not kidding.

10                  THE WITNESS:  I don't even know if we

11          have it.

12          Q.    This was a major change to the

13   compensation given to the salespeople, correct?

14          A.    It wasn't major.

15          Q.    It wasn't a major change to them?

16          A.    It wasn't major, no.

17                  It was major to some people, because when

18   you took a look at the total sales number based upon

19   the compensation, there were certain individuals that

20   stood out that they were being grossly overpaid.

21          Q.    If there were people who were being

22   grossly overpaid, why couldn't you target their pay

23   instead of changing everybody's compensation?

24          A.    Because we wanted to change to a

25   compensation plan that was geared towards growth,

119

1                        D. Liess

2    period.

3              Q.    Are you saying that there were people in

4    the sales force that were being grossly overpaid?

5              A.    Based upon the amount of sales dollars

6    they were generating, yes.

7              Q.    Who was determining their compensation?

8              A.    You have to remember that I took over an

9    organization, and I inherited some additional

10   salespeople that I had absolutely nothing to do with

11   their compensation.

12              The people at Coral Graphics were the

13   people that we were responsible for.  They were

14   people that I knew.  Most of them were ones that I

15   hired, and that is the compensation plan that we

16   worked with.

17              The others we inherited, and when we took

18   a look at where the Coral Graphics salespeople were

19   and the sales volume versus the OPM and Berryville

20   Graphics salespeople, and their sales volume, and

21   where they were, there was a huge disparity.  It was

22   not something that I was going to live with.

23              Q.    Are you talking about in 2006 or in 2007?

24              A.    You asked about the salespeople that were

25   grossly overpaid, and they were the salespeople that

1                          D. Liess

2          A.     Yes.

3          Q.     What was his name?

4          A.     Michael Gallagher.

5                 MR. HELLER:  Off the record.

6                 (Discussion off the record.)

7                 (Short recess taken: 11:18 a.m. to

8          11:24 a.m.)

9                 MR. HELLER:  Back on the record.

10   BY MR. HELLER:

11         Q.     In 2006, did the salesmen at Coral

12   Graphics have titles?

13         A.     You know, salespeople all like having a

14   very different opinion of themselves.  They feel if

15   they put "Vice-President of Midwestern Operations" or

16   "Vice-President of Midwest Sales" or "Sales Manager

17   of Midwest" or "West Coast Account Executive," they

18   feel that this is going to help them or benefit them.

19                I let them put whatever they wanted on

20   their business cards if it made them feel good and we

21   were going to get business.

22                I only want the business.  I don't care

23   what you call yourself.

24         Q.     You let them put whatever they wanted on

25   their business card?

124

1                          D. Liess

2          A.    As long as they did not put my name and

3     CEO.

4          Q.    Could they put president of something,

5     was that --

6          A.    No.

7                They were okay to go with "Sales Manager

8     of West Coast" or "Sales Manager of Midwest" or

9     whatever the case may be.

10               Certain things are just not worth getting

11    upset about, if you know what I mean.

12         Q.    If a salesman thought that a title would

13    help them sell more, that is better for the company,

14    correct?

15         A.    Yes.

16               It's all about getting the sale.

17         Q.    When did you first meet Markus Dohle?

18         A.    He was a colleague first when he was

19    running the operation over in Gutersloh, which was

20    called Mohn Media.  He and I, we would be in

21    meetings.  There were very few Americans there.

22               I can't tell you exactly when I met him,

23    but I can tell you that whenever we spoke we laughed,

24    we joked, we got along very well.

25               I could not even tell you when I first

1                           D. Liess

2    was -- it wasn't a question-and-answer period back

3    and forth.  It was that, and then we moved on to the

4    next thing.

5             I believe he was at Random House at the

6    time, and I am a salesguy, Brian, I was just looking

7    to get more business out of Random House.  That was

8    my priority for me.

9         Q.    When was the last time before that

10   conversation that you had spoken to Markus Dohle

11   about Bill Mickelsen?

12        A.    I have no idea.

13        Q.    Did you ever tell Markus Dohle before

14   that day that Bill Mickelsen had been complaining of

15   age discrimination?

16        A.    I don't believe so.

17        Q.    Did there come a time when you learned

18   that Mr. Dohle was going to become the head of Arvato

19   Print of the US?

20        A.    Yes.

21             We received a notification somewhere -- I

22   think that it was in November or December of  -- I

23   don't know what the year was, but that effective

24   January 1st of that following year he was going to be

25   taking over as head of Arvato Print worldwide, not

133

1                          D. Liess

2      just the US.

3          Q.      He had been responsible for printing in

4      other parts of the world, correct?

5          A.      Yes.

6          Q.      And now he was going to be adding on the

7      Americas?

8          A.      Yes.

9          Q.      Who had fulfilled his responsibility

10     before Mr. Dohle?

11         A.      That was Hartmut Ostrowski, he was

12     directly responsible for it, and he was looking at

13     ways to -- I am saying that it was Hartmut, but it

14     may have been Rolf Buch, I don't know whether it was

15     Hartmut or Rolf, but we obviously received the

16     notification that effective January of that following

17     year he was going to be doing it because whether it

18     was Hartmut or Rolf, they were looking to lessen

19     their responsibilities.

20         Q.      When did --

21         A.      Not their responsibilities, but have

22     somebody as an intermediary taking care of the print

23     division, as opposed to them having to do it directly

24     on their own.

25                 It's a $7 billion operation, so that

134

1                         D. Liess

2    probably was the right thing for them to do.

3         Q.    When did you first speak with Markus

4    Dohle after learning that he would fulfill that

5    position?

6         A.    I probably spoke with him in Berlin,

7    Germany, because we were away at a meeting.

8                Berryville Graphics was performing very,

9    very poorly at time, and Markus had the management

10   team from Berryville Graphics in Berlin because we

11   were all over there for this big meeting, and he had

12   them in an all-day meeting, wanting to hear a plan to

13   get Berryville Graphics back on the right track.

14               It wasn't until at dinner that night that

15   I saw him, and congratulated him, and said that "I am

16   looking forward to working with you."

17        Q.    When was this?

18        A.    I don't know the year.

19               It was in December of -- maybe December

20   of '07, I think, maybe.

21        Q.    Markus Dohle took over in the beginning

22   of '07?

23        A.    If it was the beginning of '07, then this

24   meeting was at the end of '06.

25               You know more about the company than I

138

1                          D. Liess

2    were there communication problems between those two

3    sets of companies?

4          A.    There are four companies that you are

5    talking about.

6          Q.    Let me break this down.

7                You were responsible for two companies,

8    correct?

9          A.    Correct.

10         Q.    And Michael Gallagher was responsible for

11   another two companies, correct?

12         A.    Yes.

13         Q.    You were responsible for Coral Graphics

14   and Dynamic Finishing, and Michael Gallagher was

15   responsible for OPM and Berryville Graphics, correct?

16         A.    Yes.

17         Q.    Were their difficulties between your set

18   of companies and Mr. Gallagher's set of companies in

19   early 2007?

20         A.    Difficulties with the companies?

21   Difficulties in the way we worked together?

22         Q.    Yes.

23         A.    No.

24         Q.    Were there communication problems between

25   the two companies?

139
1                          D. Liess
2          A.    No.
3          Q.    Was there any reason to change the
4    structure as it existed at that time that you were
5    aware of?
6          A.    Well, the only reason at that time would
7    have been the unhappiness that Bertelsmann and, I
8    guess, Markus Dohle had about Berryville Graphics.
9          Q.    Other than Berryville Graphics, were you
10   aware of any reason to change the structure of Arvato
11   Print as it existed at that time?
12         A.    No, not really.
13         Q.    You were aware of any customer complaints
14   about the structure of Arvato Print US at that time?
15         A.    I think that Random House was getting a
16   little bit concerned with the way that things were
17   going.
18               They enjoyed the way their relationship
19   was going with Coral Graphics and Dynamic Graphics.
20               They were very unhappy with the way that
21   things were going with Offset Paperback and
22   Berryville Graphics.  It was primarily Random House
23   driven.
24         Q.    What was primarily Random House driven?
25         A.    The concerns about the way that the

140

1                     D. Liess

2    companies were.

3              They liked my "can do" approach.  I'm a

4    sales guy.  I will take a bullet for a customer, and

5    my customers know that I will take a bullet for them.

6              Mike, on the other hand, was more

7    operational, and it is more what is best for my

8    company, as opposed to what is best for my customer.

9              That philosophy will not give you

10   longevity.  Longevity will come from taking care of

11   your customer and changing with their needs and their

12   requirements.

13             Their biggest complaint at Random House

14   was the fact that Offset Paperback, Berryville, you

15   can say Michael Gallagher, if you want, you can say

16   Joe Makarewicz, but we will just say the companies,

17   they were not happy with the way that those two

18   companies were responding to their needs and wants.

19        Q.   Were you aware of any other customers

20   that had any complaints like those of Random House?

21        A.   Official complaints or -- there is a

22   difference between what would be an official

23   complaint and what you would hear if you were going

24   out to dinner or something like that.

25             It is very safe to say that a majority,